Carlos Martinez
Appeal No: 18368-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Stewart Grove

May 10th 2012

Mr. Lunsford,

    I wanted to start off by thanking you for the opportunity to meet with you in person and discuss the concerns I have regarding the management at the Great Southwest Council. The first concern that greatly affects the whole staff's ability to be successful is the hostile work environment that Chris Shelby and Lloyd Lyman have created. Specifically the elements of our hostile work environment stem from Chris' threatening nature, use of profanity and the posture that he uses when addressing staff. I highlighted this behavior in the documentation I emailed you two weeks ago. In a nutshell when there is an issue that comes up that Chris is not happy about and the staff member involved does not agree with Chris' point of view he literally beats staff into submission through threats of termination, raising his voice to an intimidating level, and he stands up and waves his figure in the face of the staff while Chris' face turns plush red. I wish that this was only an issue that I personally have had to witness and live through but a majority of all the other full-time staff have been witnessed this behavior in one form or another.

During the Philmont retreat Chris had one of his outbursts in front of the whole staff. Jennifer Young, Sandia District Executive, was expressing her concern regarding the way that vacation time was allowed to be used around Christmas. Chris stepped and in front of the whole staff in attendance and said, "I'm the fucking Scout Executive and if you don't like it you can leave". Jennifer responded by saying that, "If you would like to yell and shame me in front of the whole staff can we at least step outside." Chris responded by saying, "You can spread your bad attitude in front of everyone so I should be able to do the same."

I fortunately was not present when this Chris' outburst took place but I wanted to document and share it with you because this outburst can be verified by every staff member that was present during the Philmont planning conference and is a text book example of Chris' hostile and unprofessional management style. There is also a volunteer who has witnessed the harshness and intimidating manner in which Chris deals with staff. This individual was waiting to meet with Chris and heard the intimidating and bully like nature that Chris was interacting with a staff member. This volunteer stated that, "In my 25 years of being a manager I have never yelled at one of my staff like that and I would never treat them in the way I witnessed Chris treating them." Shortly after witnessing Chris' manner in dealing with his staff this volunteer decided that they no longer wanted to continue volunteering for the Great Southwest Council. If you are interested to hear this account directly from this volunteer I would be happy to put you in touch with them so you can hear their account directly from them.

If there was some time spent interviewing and talking with staff in an environment where they didn't feel like sharing their story would compromise their jobs I am have no doubt that you would hear similar stories from almost all the staff. Chris' hostile, intimidating and unprofessional management style makes our staff feel unsupported, on edge and basically miserable when we come to work. Since I started working for the Great Southwest Council in

Exhibit K

EXHIBIT U

0018
Martinez 13cv1049

Appeal No: 18368-2017-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Stewart Grove

August of 2009 I have seen a complete staff turnover and now we are on track to turn over the staff again completely for a second time. Sandia and Rio Grande district, our council's largest districts, have had a total of four different District Executives in the past two and half years. With these two districts compromising the largest amount of our membership and the biggest potential for growth it is unfortunate that we have not been able to create a sense of stability and support for our Scouters in those districts.

Chris has stated at staff meeting that "I know that all the Sandia volunteers hate me, that is why I need you guys to be the buffer and smooth things out." This was said during our last quarterly staff meeting in April. It is unfortunate that Chris feels that volunteers from the largest district in our council do not like him. During last year's camporee Chris was terrified to make an appearance because he feared the lack of warm welcome he would receive. This apprehension that Chris feels is rooted in his lack of people skills when it comes to staff and the majority of volunteers in the council. Where Chris excels is with most board members and large donors. This skill to keep board members happy has been the key to his success and has gotten him to where he is today. Unfortunately as one staff member so accurately put it, "If Chris would only treat us ten percent as nice as he treats his precious board members maybe we wouldn't all want to quit."

I also question Chris' transparency when it comes to managing funds and fundraising. For the past three years we have gone to United Way and asked to donate to the Juvenile Diversion Program specifically to help pay to send our participants to summer camp. The part that makes me feel uncomfortable is that our Federal Grant covers the cost to send our youth to summer camp one hundred percent. So my question is why are we telling United Way that we need the money to send kids to camp when really we don't? When this issue has come up during our interactions with United Way I have always asked Chris to field these financial questions because I didn't' feel comfortable answering them. I always wanted to confront Chris on this issue amongst others but felt that if I did I would be terminated on the spot. Chris also did this when we received funding to for Hispanic Initiatives. Chris hired Luis and used the funds to have him run the EVM district. Luis did not or was not asked to do a single thing in regards to Hispanic Initiative for several months. It was only after a board member asked how Luis' Hispanic Initiative work was going Lloyd and Chris begin to allow Luis to start working on some of the goals of Hispanic Initiatives.

I share these concerns and thoughts now because it has become apparent to me that Chris and Lloyd are trying to find a way to justify terminating me. If you try hard enough and look long enough you will find the bad in someone. Despite my desire to keep my job and continue to help the Juvenile Program thrive and grow I feel the vice that Chris and Lloyd are putting on me will result in them terminating me only because despite the hostile and unsupportive conditions that Chris' and Lloyd but upon me I refuse to quit. I see myself as the advocate for the Juvenile Diversion Program and don't have any confidence that once I am gone that Chris or Lloyd will look out for its best interest.

As a staff we were all hoping that Lloyd Lyman would balance out some of Chris' shortcoming as a supervisor. Unfortunately Lloyd has made it more difficult for us to be successful and instead of being a balance and go between for the staff and Chris' Lloyd has basically become

0019
Martinez 13cv1049

Carlos Martinez
Appeal No: 18368-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Stewart Grove

another Chris'. Like Chris' Lloyd uses a hostile, threatening and intimidating approach to supervising his staff. Since I started my job I have managed to grow a program that had fifteen youth in one county to over a hundred youth in three counties. I managed to do this without any real direct support from Chris or the Director of Field Service. Due to the unique nature of the Juvenile Diversion Program and my equally unique work experience and background Chris initially supported me by not micro managing me and allowing me to make the decisions that I felt were best for the program. Since Lloyd has become the my manager I have been micro managed to an extreme, asked to do things that do not comply with the terms of the grant, and threatened on a constant bases with termination if I attempt to share my opinion or perspective on what is best for the program that I have been managing successfully for almost three years.

As a manager of six staff my philosophy is that my job is to support and work for my staff. As I work for them and give them what they need I feel confident that they can be successful and in turn run a great program. My model has been extremely successful and this can be seen by the fact that I have a high retention rate for my staff and they all feel safe and supported by me. As time has gone on our program has been recognized as model program in the State of New Mexico and we have even gotten national recognition. Our participants and families also have nothing but good things to say about the program I have been fortunate to help start and manage over the years. I can unfortunately say that since Lloyd has become my manager my job as become more difficult because of his micro managing and insistence on not taking my recommendations seriously on how to continue to support our growing and thriving program.

I appreciate you reading this letter and hope that is was helpful to at least inform you of the obstacles we are trying to overcome as dedicated professional scouters at the Great Southwest Council.

Sincerely,

Carlos Martinez
Program Director
Scoutreach Juvenile Diversion Program.

Carlos Martinez
Appeal No: 18368-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Stewart Grove

C 1

12-22-2011

Carlos Martinez

## HOSTILE WORK ENVIRONMENT REPORT

To Whom It May Concern:

    On Thursday, December 22, 2011 I left my office at 11 AM to go to lunch. I was looking forward to enjoying a lunch with my two sons. After our lunch I was going to drop them off at my parent's house and was planning on returning to work. At this point in my two and half years of working with the Great Southwest Council (GSWC) and five plus years working for the Boy Scouts of America (BSA) I have never receive a negative reprimand of any sort nor has my work integrity or quality ever been questioned or suspect. Also in five plus years with the BSA I have never had to check out with my supervisor when I left for lunch. This is also true for all the other full-time staff members at the GSWC and my previous council, Samoset, in Wisconsin.

    While on my lunch break I received a phone call from my supervisor, Lloyd Lyman. Upon answering the phone call I informed Mr. Lyman that my cell phone battery was about to die and that our conversation might be cut short. Mr. Lyman, was very upset, his tone was very aggressive and he was yelling at me. According to Mr. Lyman, the reason for him having lost his temper was that I had left a new employee unattended at the office. I assured him that there was no reason to be upset; I had spent a good amount of time with Ms. Unzueta the day before and also meet with her early that morning training her on the operation of our program. Her and I had planned out what work she was going to accomplish during the day and I went over any questions she had. She was just going to be staying at the office for a few hours. Ms. Unzueta has over 15 years of professional experience and I hired her due to her independent nature and take charge attitude. When I left the office I let Ms. Unzueta know that I would be leaving and made sure that she didn't have any questions about the work she was going to accomplish. She did not and then soon after I left for lunch. It is also worth noting that it is not customary in our office, for supervisors to be present in the office at all times when the employees that are under their supervision are present. This is true of Mr. Lyman, Mr. Shelby, Mr. Rhien, and Ms. Richardson, who all supervise other employees in our office.

    In regards to my staff training practices, during my two and half years as the Program Director of the Scoutreach Juvenile Diversion program (SJDP), I have trained over seven staff members. Never once has Mr. Shelby or Mr. Lineman taken any interest or given me any negative feedback regarding how I went about training new staff members. If anything their feedback has been positive and encouraging. I was caught very off guard at Mr. Lyman's sudden disapproval of my staff training procedures and his aggressive and hostile tone really caught me off guard. I assured him that he was over reacting and that everything was okay. Mr. Lyman, demanded that I "return to the office this instant and supervise my employee". I informed Mr. Lyman that it would be very difficult to return right away because I was on my lunch break with my two young children ages two and four.

Exhibit J

0021
Martinez 13cv1049

Carlos Martinez
Appeal No: 1834-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Steward Grove

C2

According to Mr. Lyman, I needed to return right away because Ms. Unzueta was cleaning and organizing our program's storage shelves unattended and that I needed to return right away and supervise her. This particular issue didn't seem to make sense to me because I have had my staff organize and clean that shelf on numerous occasions over my tenure with the GSWC and it had never been an issue or concern before. I assured Mr. Lyman that Ms. Unzueta was more than capable of organizing and cleaning the shelves on her own and that no immediate or intensive supervision was needed for this task. The conversation was very difficult on my end because Mr. Lyman was very upset and was yelling at me on the phone. I felt very threatened and uncomfortable by his tone. I also felt his reaction to this situation to be incredibly unprofessional and unwarranted but wanted to do everything I possibly could to resolve the issue at hand so that Mr. Lyman would calm down. At this point my phone died and the call was dropped. I had enough battery to still send Mr. Lyman a text. I sent him the following text message from my phone, "I didn't hand up. My battery died. Sorry about that." As soon as I got to my lunch destination I was able to plug in my phone and call Mr. Lyman. He didn't pick up his phone so I left him a message. In my message I apologized again for my phone hanging up and asked him to call me back and let me know what he needed me to do in order to resolve this situation.

Before my children and I got a chance to eat lunch, Mr. Shelby, Mr. Lyman's supervisor, texted me the following message, "Carlos: Lloyd has told you to come in the office and I recommend you do just that." I responded to Mr. Shelby's text with the following text, "Yes sir". I promptly left the lunch with my kids even though we had not eaten yet and drove back to work. I would have preferred to have come a bit latter after having dropped of my boys with family and having eaten lunch but the urgency that Mr. Lyman and Mr. Shelby were portraying was one of an immediate nature. Before I started the drive back to the office I called Mr. Lyman, who answered his phone this time, and informed him that I was on my way to the office. I wanted to make sure that he needed me to come to the office immediately and informed him that I have my two young children with me. Mr. Lyman said yes come right away.

I felt very bad for not having the opportunity to feed my children lunch and having to include them in this escalating hostile situation. Upon arriving I was lucky that my two year son had fallen asleep. I had no choice but to leave him unattended on the floor of my cubicle. I left my other son, my four year old, at my desk playing a computer game. I felt really uncomfortable and not okay with leaving my two young children unattended in an unsafe work area but felt that I had no choice due to the aggressive and threatening tone that Mr. Lyman had already been exhibiting over the phone. I felt that somehow my job was in jeopardy due to this unfortunate miscommunication with my two supervisors. I reluctantly left my children unsupervised and entered the office of Mr. Shelby with Mr. Lyman in attendance.

The door was then closed to Mr. Shelby's office and the first thing that Mr. Shelby's said to me was, "I ought to fire you right now". Mr. Shelby has a history of having a very hostile and threatening management style when it comes to addressing staff issues. Fifty percent or more of the full-time employees that Mr. Shelby hires either quite or are fired within their first three years with our council. A majority of these employment terminations have ended in a very negative fashion. Mr. Shelby has already been investigated once recently by our National Organization for the manner in which one of our employees was terminated. Since I started working for the Council in August of 2009, eight full-time employees have either quite or been fired on negative terms. With this in mind I entered this closed door meeting emotionally fearful for my future career with the BSA. I was more importantly fearful for my ability to be able to provide for my family financially if I were to be terminated despite my five plus years

0022
Martinez 13cv1049

Carlos Martinez
Appeal No: 18368-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge Stewart Grove

C3

of excellent service with the BSA.

My immediate response to Mr. Shelby's statement, "I ought to fire you right now!", was "Why is that". He responded, "For insubordination, for not coming into the office after your supervisor, Lloyd asked you to". Mr. Shelby's tone was even more aggressive and hostile then that of Mr. Lyman. Mr. Shelby's face was notably flush and he was leaning over his desk in a threatening and hostile manner. He would stare at me straight in the eyes in a hostile manner and his body language reflected him daring me to make eye contact with him. Mr. Shelby was not squarely seated in his chair but was leaning forward, leaning over his work, with both his hands on his desk as if he were about to jump out of his seat and attack me if I happened to respond in an unfavorable manner. Mr. Shelby continued this posture for the remainder of the meeting.

I responded to Mr. Shelby stating that I don't believe that I was unsubordinated and stated my point of view of how I had communicated with Mr. Lyman my situation of being at lunch with my children. After our conversation was cut short due to my phone dying, I did call Mr. Lyman and leave a message asking him to call me back and let me know what I needed to do to right the situation. At this point Mr. Lyman chimed in and continuing in his previous hostile tone and manner told me that it was perfectly clear what he wanted me to do. I responded by saying that it was not perfectly clear, our conversation ended abruptly due to the dropped call and that is why I called back hoping to finish our conversation so that I could have some clarity as to what I needed to do. At this point, Mr. Shelby again continued his threatening manner and stated, "I ought to fire you right now!".

I already felt extremely threatened and fearful before I even stepped foot into Mr. Shelby's office but I must admit that I have never in my entire professional career felt as belittled and threatened as I did during this meeting with Mr. Shelby and Mr. Lyman. Our meeting lasted more or less forty minutes and I estimate that I was threatened to be fired ten to twelve times. If I attempted to respond to any of the accusations by Mr. Shelby or Mr. Lyman I was immediately threatened by termination. At this point I decided to agree with everything that Mr. Shelby and Mr. Lyman said and just listen attentively while not making any sort of eye contact with Mr. Shelby who continued his hostile posture throughout the entire meeting. I was responding to Mr. Shelby's by saying, "Yes sir" and Mr. Shelby responded by saying, "Don't dare call me sir". I then began responding by calling him "Mr. Shelby". Mr. Shelby responded by saying, "Don't call me Mr. Shelby". I then asked what I should call him, and he said that people call him Chris. I mention this to point out that despite my attempts to be cooperative and respectful I was only met with increasing hostility and verbal abuse.

At this point in the meeting no longer was my alleged insubordination the main issue. The subject now changed to Mr. Shelby and Mr. Lyman's lack of satisfaction with my work performance during this past year. I was already in a state of shock with everything taking place up to this point but their lack of satisfaction with my work performance came to me as a complete surprise especially this late in the year. I had been meeting with my immediate supervisor, Mr. Lyman every week for our weekly check point meeting and there was nothing that was every expressed to me that he or Mr. Shelby were unsatisfied with my work performance. If the program that I manage could be eligible for quality district status then we would have received this recognition for each of the years I have been in charge of the SDJP. This quality district status would go along with the three years I achieved quality district in my council back in Wisconsin. The Scoutreach Juvenile Diversion Program has meet its, financial,

Carlos Martinez          CH
Appeal No: 18368-2012-AT
October 10, 2012 at 9:00 AM
Administrative Law Judge
Stewart Grov

programmatic and membership goals every year that I have been in charge.

At this point I was insulted and accused of many things that I was not allowed to respond to unless I wanted to be threatened yet again by Mr. Shelby by termination. So I listened and tried by best to hold myself together emotionally while Mr. Shelby and Mr. Lyman took turns yelling and verbally abusing me. I also was very concerned with the fact that my two children were now left unattended for over half an hour. I desperately wanted to go check on them but knew that such a request would not be tolerated by Mr. Shelby.

At one point Mr. Lyman stated that, "Do you know how I feel when other staff members come up to me and ask what exactly does Carlos do and I basically don't know what to say to them". Mr. Lyman was inferring with this statement that I basically do nothing. Again this was new to be being that I had a regular meeting with Mr. Lyman and this sentiment that he now had that I do not do anything was new and shocking to me.

Mr. Lyman and Chris also brought up the fact that I had reached my seventy sales calls goal for the year but that they were not stratified with the sales calls that I had turned in. This again was not brought up in a calm and professional manner but was basically thrown in my face as another example of why I was a bad employee. I reminded Mr. Lyman that I had been working with him closely regarding these calls and that some of the calls that he had previously approved and was okay with was not all of sudden not okay. I questioned him why that was. Again, Mr. Shelby jumped in with another threat of termination and I basically resigned to silence and my best attempt to be quit and respectful as I listened.

As in any office there are issues that come up between an employee and his or her supervisor. Up to this point I had felt that Mr. Lyman and I had successfully navigated any and all of these issues professionally and had been on the same page regarding these issues. Unfortunately, Mr. Lyman took this opportunity to bring up all these issue that he and I had worked through together and basically use them to paint me in a negative light in front of Mr. Shelby who was more than ready and willing to use these to continue the attack on my integrity. An accurate term to describe this was simply Lloyd through me under the bus.

One particular example was that as recent as a few weeks ago I had a concern about three Exploring Posts that Mr. Lyman was asking me to start. I did not feel comfortable in the manner in which I was being asked to start these Posts. I felt that it was going against the membership standards that the BSA has in place to prevent membership fraud. After sitting with Mr. Lyman and navigating my concerns I felt a little better regarding my concerns within a week's time I turned in the three completed Posts. I was sensitive to the topic of membership fraud because in 2009 I was asked to start three Venture Crews that ended up being ghost crews and never held a single meeting. I was asked to start these in order to help us reach our end of the year membership goal. This time around I didn't want to have the same heavy weight on my conscious and so I wanted to make sure I was 110% sure that these Posts were legitimate. Mr. Lyman brought this incident up as an example of me not being a team player and belittled me for the manner in which I was reluctant to start the Posts up.

Unfortunately my transition from my pleasant experience with the Samoset Council to the Great Southwest Council has been very rough. I felt that at Samoset workers were treated with professionalism and respect and that employee were never put in a situation where they felt comprised to do what their

0024
Martinez 13cv1049

*Carlos Martinez*
*Appeal No: 1836 c-2012-AT*
*October 10, 2012 at 9:00 AM*
*Administrative Law Judge Stewart Grow*

C 5

supervisor was asking them to do and what was ethical. During my first year with the Great Southwest Council I was in the middle of a very uncomfortable situation. My position was funded 100% by a grant we received from the Federal Government, to manage a program that we had proposed to the Office of Juvenile Justice and Delinquency Prevention. The issue was that 95% of the work I was assigned had nothing to do with that program we promised to deliver in the grant. By April of 2010 I had been promoted to the position of District Director and was managing two District Executives who were in charge of the two largest metropolitan areas in our council. Before attending Professional Development 3 (PDL3) I was also offered the position of Director of Field Service, that my current supervisor, Mr. Lyman now has.

As I was receiving a majority of my salary to run a program I no longer had time to run our council was utilizing these Federal funds to pay me to do work that had nothing to do with our grant proposal. I had approached Mr. Shelby on several occasions regarding how I felt uncomfortable regarding this arrangement but he basically ignored my concerns. My two staff members who were trying to run the Scoutreach Juvenile Diversion Program without my guidance or supervision eventually quit. I convinced them to stay on board and I promptly went to Mr. Shelby and gave an ultimatum that I would like him to demote me to my original position of Program Director or else I was going to quit my job. I basically I could no longer in good conscious continue working as I had even if Mr. Shelby had given me no choice. At this point Mr. Shelby accepted my written terms of demotion and let me focus on my job as the Program Director of the Scoutreach Juvenile Diversion Program. Our independent auditors later on in the year brought up this red flag in our accounting and warned us that we should not have been using our Federal Funds in such a way.

At this point Mr. Shelby and my professional relationship took a negative turn because I believe that he did not like me standing up to him on issues that he felt were not to be brought up or challenged. Recently Emily Kelly, our Program Director, for over three years quit her job because she like many others before her could no longer tolerate the hostile work environment that Mr. Shelby and now Mr. Lyman collectively create. Ms. Kelly had been brought to tears on several occasions during meetings with Mr. Shelby and she eventually resigned due to the hostile work environment. I was deeply disturbed by this management trend of Mr. Shelby and now Mr. Lyman so I met with Ron Lunsford, Mr. Shelby's supervisor and also with our board President, Ben Miller to at least express my concerns. I knew that nothing would really change regarding the hostile work environment but I could no longer sit on the sidelines as another potentially good employee was set up to fail because of lack of quality leadership and management. I am speculate that the fact that I approached Mr. Lunsford and Mr. Miller further infuriated Mr. Shelby and I believe that he has been waiting for an opportunity to pay me back for me stating my concerns to his superiors. Promptly after I met with Mr. Miller and Mr. Lunsford, Mr. Shelby met with me and warned me to not every do such a thing again. I would have loved to have approached Mr. Shelby with these concerns but did not feel that he was approachable regarding these issues not then and certainly not now.

It is worth noting that starting in August of 2011, I began as a part-time student at the University of New Mexico School of Law. Mr. Shelby at the time of my application to school was very supportive and even wrote me a letter of recommendation. Mr. Lyman, and myself were able to work together to create a schedule that would allow me to start school and also keep up with my work obligations. I can honestly say that after having finished my first semester of part-time law school I was able to be

Carlos Martinez
Appeal No: 18368-2012-NT
October 10, 2012 at 9:00 AM
Administrative Law Judge Steward Grove

C6

successful as a Program Director for the Boy Scouts and also as a law student. Until this meeting with Mr. Lyman and Chris I had not heard anything negative regarding this arrangement. Ron Lunsford, Mr. Shelby's supervisor, even put me in touch with another BSA professional who had recently accomplished what I was attempting and he was able to utilize his legal education to help out the council he was working for.

With all this said you can imagine my surprise when Mr. Shelby said, "I feel like a fool". I then asked him "why was that?" He responded with, "I feel that our council has basically paid for your first year of law school and we got nothing for it". This comment was very hurtful to me because I know that it is not true and that I had accomplished many things over the last semester at work, but knew that at this point I was not allowed to respond to anything Mr. Shelby or Mr. Lyman had to say.

Toward the end of this meeting I was on the verge of tears, which has never happened to me in my professional career and I was sick to my stomach with worry about my children's safety. I sat silent for a good ten to fifteen minutes as Mr. Shelby and Mr. Lyman continued with their harsh criticisms. When I felt that there was an opportune moment I asked if I could apologize. To be honest I was not certain exactly what I was apologizing for but it was obvious that they were upset with me for so many different things and I thought that an apology would be the only acceptable thing that would be tolerated to be said. I was excused and Mr. Lyman and I set a date to meet first thing Tuesday morning to go over any follow up that was needed from the topics discussed from our meeting.

Before my apology Mr. Shelby stated that he wanted to be clear that I was no longer allowed to go to law school next year and the only way that he would even consider that matter unless Mr. Lyman somehow was able to convince him otherwise. I left this meeting in tears and was just so relived to be able to finally be able to check on my two children. Luckily they were both okay, my two year old was miraculously still asleep and my four year old was diligently playing video games on the computer. I was docked a half days pay for that day as a consequence for not supervising my employee and frankly I was just relived to be able to leave the office and finally try and feed my children. Most importantly I really needed to process what had just taken place.

As I drove away I felt so belittled and sick to my stomach with anxiety over everything that had just taken place. In my fifteen years in the work force I have never had to endure such a negative experience. The unfortunate part of this was that many other employees before me have had to deal with the same hostile work environment that I had to navigate that day and many more will have to go through the same experience as they begin their tenure with the GSWC.

It is my prediction that during my nine o'clock meeting with Mr. Lyman on December 27th, I will be asked a sign an employment contract that will be much different than the one that is currently on file. This new contract will be created with the intention that there is no way that I can practically be successful in law school and at work and therefore I will be forced to quit or most probably be fired. I am an Eagle Scout, served on staff at Philmont Scout Ranch for four summers, served successfully as a professional with the Boy Scouts for over five years and what I had to endure on this day, Thursday, December 22, 2011 is my saddest moment as a lifelong Scouter and as a human being in the work force. In documenting this incident and bringing up other issues that have taken place prior I hope that perhaps some positive steps can be taken to resolve the hostile work environment and the lack of professionalism that I believe every Boy Scout Council strives for as we represent the number one youth program for our

0026
Martinez 13cv1049

*Carlos Martinez*
*Appeal No: 18368-2012-AT*
*October 10, 2012 at 9:00 AM*
*Administrative Law Judge Stewart*
*C7*
*Gcou-*

young men in the U.S. Any advice, feedback, or action that may save my career with the BSA or at least create a better work environment for those employees that come after me would be greatly appreciated.

Yours in Scouting,

*Carlos Martinez*

Carlos E. Martinez

Program Director for the Scout Reach Juvenile Program

Great Southwest Council, Boy Scouts of America

0027
Martinez 13cv1049