```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF NEW MEXICO


CARLOS E. MARTINEZ,
       Plaintiff,

VS.                              NO. 13cv1049 RB/RHS

GREAT SOUTHWEST COUNCIL-
BOY SCOUTS OF AMERICA, and
CHRIS SHELBY, in his individual
capacity,
       Defendants.


     *******************************************
               DEPOSITION OF CHRIS SHELBY
                     June 19, 2014
                       1:04 p.m.
                   5732 Osuna Rd. NE
              Albuquerque, New Mexico 87109
     *******************************************



          PURSUANT TO THE FEDERAL RULES OF CIVIL
     PROCEDURE, this deposition was:

     TAKEN BY:   Mr. Michael E. Mozes
                 ATTORNEY FOR PLAINTIFF

     REPORTED BY: Jeannine K. Sims, RPR, NM CCR #12
                  Paul Baca Court Reporters
                  500 Fourth Street NW, Suite 105
                  Albuquerque, New Mexico  87102
```

EXHIBIT 3

**Page 42**

1   Q. You were his supervisor --
2   A. I think --
3   Q. -- in his chain --
4       MR. ARCHULETA: Okay. Hold on. This is
5   getting argumentative. Let's -- why don't we -- let's
6   see. Is there a question on the table?
7       MR. MOZES: Yeah, there is.
8   Q. (BY MR. MOZES) Weren't you in his
9   supervisory chain?
10      MR. ARCHULETA: Okay. You can answer that.
11  A. In his supervisory chain, yes.
12  Q. (BY MR. MOZES) All right. And would it be
13  fair to say that while Mr. Martinez was at the Boy Scouts
14  of America you were involved in decisions with regards to
15  his job assignments, how he spent his time in the
16  workplace --
17  A. Certainly. That's very fair.
18  Q. All right. Did you have any duties and
19  responsibilities related to his performance evaluations?
20  A. I reviewed his performance evaluation after
21  it was conducted and reviewed with his immediate
22  supervisor.
23  Q. Right. And certainly you felt in reviewing
24  and approving those performance evaluations, you
25  certainly felt like you had enough knowledge to do that,

**Page 43**

1   right?
2   A. To -- to sign off on his appraisal? His
3   review?
4   Q. To review and approve.
5   A. I had enough knowledge?
6   Q. I mean, you felt comfortable in being able
7   to do that.
8   A. Certainly. That's part of the process.
9   Certainly.
10  Q. Yeah. And would it also be fair to say that
11  you sufficiently observed Carlos' work ethic and work
12  product in the workplace to have an informed opinion
13  about how he was performing?
14  A. My main observations of any employee,
15  including Carlos, is looking at the productivity that's
16  outlined in the SMART goals. I rely on Lloyd as the
17  immediate supervisor to interpret such things as
18  competencies in the employee evaluation.
19  Q. Yeah. That's not responsive to my question.
20  My question was, did you observe Mr. Martinez
21  sufficiently in the workplace with regards to his work
22  performance and work product to have an informed opinion
23  when you made the review and approval of his performance
24  evaluation? That's what my question was.
25  A. Well, you know, I recognize the question.

**Page 44**

1   And I'm attempting to give you the full answer so that
2   you can -- so I can assist you in understanding how that
3   process works. Now, with that said, I think I had a *good*
4   view of the staff members who were working for Lloyd
5   enough to be able to sign off and agree with the
6   appraisal. Does that answer the question?
7   Q. I think so.
8       MR. ARCHULETA: Mike, let's take a break,
9   please.
10      MR. MOZES: Huh?
11      MR. ARCHULETA: Let's take a break. It's
12  2:15.
13      MR. MOZES: Sure.
14      (Break from 2:14 to 2:26.)
15  Q. (BY MR. MOZES) All right. We're back on
16  the record. We're still on that document. Would you
17  agree with me it was prohibited at the Boy Scouts of
18  America for an employee to be retaliated against for
19  reporting an incident or an issue to the President of the
20  Council?
21  A. Yes.
22  Q. Now, if you'll just drop down one, it's that
23  next complaint procedure. See where I'm referring to?
24  A. Uh-huh.
25  Q. Investigation. I'm sorry. "Investigation

**Page 45**

1   of Complaint." First sentence, I'm just going to read
2   it. "All complaints of harassment that are reported to
3   management will be investigated promptly and thoroughly
4   and corrective action will be taken where warranted."
5   Now, this is the way I read it. See if we agree. I read
6   that to say if any employee brings forward any complaint
7   of harassment, that it will be investigated promptly and
8   thoroughly. Is that the way you read it?
9   A. That's the way I read it.
10  Q. Now, what was your role if any, Mr. Shelby,
11  in the investigation that was conducted into the
12  allegations that Hope Kitts brought forward in July of
13  2012?
14  A. No role.
15  Q. None?
16  A. No role.
17  Q. And if I understand correctly -- and I want
18  you to correct me if I'm wrong -- your only involvement
19  in that series of events was to sign off on the letter of
20  termination.
21  A. Correct.
22  Q. Now, were you present when that letter of
23  termination was delivered to Carlos?
24  A. No.
25  Q. Did you ever have any conversations with

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102

Page 46

1  Carlos Martinez about the content of that letter of
2  termination?
3       A.  No.
4       Q.  And as a matter of fact, although you signed
5  it you did not write it.
6       A.  Correct.
7       Q.  And you understood that in signing that
8  document that you were performing an administrative
9  function as Carlos' -- as the Scout Executive in that
10 office to sign off on a termination, right?
11      A.  Yes.
12      Q.  Who replaced Carlos?
13      A.  We brought in Barbara Johnson to work
14 part-time in that role.
15      Q.  Right. So that went from a full-time
16 position to about a 20-hour-a-week position, right?
17      A.  Approximately.
18      Q.  Yeah. And Barbara Johnson actually was not
19 brought in to fill that position for about three or four
20 months, right? She did not immediately take that over.
21      A.  I don't recall the specific timeframe for
22 that. I'd have to look at the employment letter.
23      Q.  Did you hire Ms. Johnson into that position?
24      A.  I believe so.
25      Q.  Why did you hire Ms. Johnson?

Page 47

1       A.  She had experience in working in the
2  program.
3       Q.  And -- and why did you make that position a
4  part-time position?
5       A.  That's all that Barbara wanted to do.
6       Q.  Was that a competitive bid?
7       A.  The position?
8       Q.  Yeah.
9       A.  No.
10      Q.  Why not?
11      A.  I don't think anyone could have stepped into
12 that role and be able to keep the program moving in the
13 direction it was headed unless they had experience within
14 that program.
15      Q.  Okay. Now, I want to make sure I understand
16 what you just said. I understand you to be saying, "If
17 we had opened that position to a competitive bid for a
18 full-time employee, I do not believe there was anyone who
19 could have met the requirements and/or the qualifications
20 for the position." Right?
21      A.  I believed because of Barbara's experience
22 as an adult probation officer and her experience in the
23 program, she was the candidate. If we had opened it up
24 to a competitive bid, which by the way is not standard in
25 the Boy Scouts of America, she would have been the ideal

Page 48

1  candidate. She was very -- very firm that she only
2  wanted to work part-time. She was very good at saying
3  what she wanted to do and what she didn't want to do.
4  And she seemed like the logical choice. Had to come from
5  within, in my opinion.
6       Q.  Let me hand you what was marked as
7  Lunsford 8.
8       A.  Okay.
9       Q.  Now, the only question I have for you
10 related to this document --
11      MR. ARCHULETA: Go ahead, Mike.
12      MR. MOZES: He doesn't need to read it. Is
13 that what you were --
14      MR. ARCHULETA: No. He offered to show it
15 to me and I said, "No, you don't have to." So I think
16 our hand movements were interpreted --
17      THE WITNESS: Am I not allowed to do that?
18 I thought you were needing to see what documents.
19      MR. ARCHULETA: Absolutely fine. Go ahead
20 with your question, Mike.
21      Q.  (BY MR. MOZES) My understanding is when
22 this resignation came in from Juliana Cabral -- you knew
23 Ms. Cabral, right?
24      A.  Yeah. Yes, she was an employee.
25      Q.  Yeah. You were not in the workplace, were

Page 49

1  you?
2       A.  Correct.
3       Q.  And would it be fair to say that prior to
4  terminating Carlos on July 27th, 2012, that's the date,
5  that you did not know this document existed, did you?
6       A.  Correct.
7       Q.  Okay. Now, I want to talk to you for a
8  little bit about while you were on this leave of absence,
9  did you tell Lloyd Lyman, "Hey listen, Lloyd. If
10 something comes up in the workplace feel free to call
11 me"?
12      A.  No.
13      Q.  Did you tell anybody that?
14      A.  No.
15      Q.  Would it be fair to say during those five
16 weeks when you were on that leave of absence that you had
17 no communications with Boy Scout employees?
18      A.  That would be fair.
19      Q.  Now, I want to talk to you for a little bit
20 about sexual harassment training, all right?
21      A.  Uh-huh.
22      Q.  Now, one of the allegations that Ms. Cabral
23 makes, and you know, I just want to -- well, here. I've
24 got a copy of it. If you will turn to Page 2. And I'm
25 in the first paragraph. You see that first paragraph?

Page 54

1  that indicates that this incident with Liza Bley occurred
2  some point prior to June of 2011, right?
3      A. I believe so.
4      Q. Okay. There we go. Now, and it is true, is
5  it not, that between that incident occurring, June 14th
6  of 2012 when Ms. Cabral wrote this resignation letter,
7  there had been no sexual harassment training in the
8  workplace, right?
9      A. Because it was being revamped by the
10 national organization.
11     Q. Yeah.
12     A. It's correct. But you just can't say it
13 didn't happen without understanding the parameters around
14 it.
15     Q. Right.
16     A. You know, and the whole sexual harassment
17 training program is conducted by the national
18 organization through webinars. That way they can have
19 documentation that people have taken it. We receive
20 those e-mails from the national organization I think at
21 that time it was every two years to take the training.
22     Q. Uh-huh.
23     A. They revamped it and as soon as we were able
24 to get it up and running from the national organization,
25 we conducted it.

Page 55

1      Q. Now, are you able to tell me whether any
2  sexual harassment training was ever conducted at the Boy
3  Scouts of America's offices for the Great Southwest
4  Council in 2011?
5      A. No. It was being revamped.
6      Q. All right. And so what I understand your
7  testimony to be is that that revamping, I'm going to call
8  it a process. I don't know if it was a process or not
9  but I'm going to call it a process. That revamping
10 process for that sexual harassment training took over a
11 year.
12     A. As I understand it, yeah.
13     Q. Okay. And I want to get to that whole
14 diversity thing. It's that last paragraph. "I would
15 strongly suggest the office to adopt not only a sexual
16 harassment training but also a diversity training and
17 better ways to intentionally support and value Scoutreach
18 and all of it employees for that matter." So it's not
19 that Ms. Cabral was talking about diversity training, she
20 was talking about sexual harassment training and
21 diversity training, right?
22     A. Correct. But she was never asked to set up
23 sexual harassment training in the office. She can't
24 speak other than through hearsay to say it was a token
25 interview. She was not in the interview. She was not in

Page 56

1  the room, she heard it from Liza. In my opinion we did a
2  very good interview with her, we suspended Chase, and he
3  got a written letter of reprimand.
4      Q. He did?
5      A. Yes.
6      Q. When?
7      A. After he returned back to work.
8      Q. In 2011?
9      A. I believe so.
10     Q. You don't know, do you?
11     A. I don't remember the dates. You know, sir,
12 I would love to give you as much of the details as I can.
13 I just don't remember the date.
14     Q. Do -- did you ever sign off on a letter of
15 reprimand to Chase Wixon?
16     A. Yes.
17     Q. Are there any documents? See, I don't have
18 any -- are there any documents that would corroborate
19 your testimony on this record today, sir, with regards
20 to, "I conducted something more than a token interview
21 with Liza Bley"?
22     A. No. But I am under oath, correct?
23     Q. I don't understand your question.
24     A. Well, there's no written documents but
25 you're asking me to tell the truth.

Page 57

1      Q. Well, see, I -- you know, okay. Let's go
2  there. How could you possibly sit there in that chair
3  under oath and testify that you conducted an adequate
4  investigation into Ms. Bley's complaints when you don't
5  even have a written document to show you investigated it?
6  How can you say that, sir?
7      A. Well, I guess it's from my side. I felt
8  that we conducted an adequate interview.
9      Q. Well, I mean, Mr. Shelby, with regards to
10 conducting sexual harassment investigations for the Boy
11 Scouts of America it's not about what you think is
12 adequate. It's about what the Boy Scouts thinks is
13 adequate, right?
14     A. I believe it was an adequate interview.
15     Q. Okay. What occurred at the interview?
16     A. We sat down with Liza and we asked her what
17 happened. We listened to her, we told her that Chase was
18 under suspension until we can get to the bottom of this.
19     Q. Who's "we"?
20     A. Caryl Sharp is the Council Program Director.
21     Q. With regards to that investigation did you
22 speak to anyone other than Liza Bley?
23     A. I spoke to Liza and I spoke to Chase.
24     Q. Is there anything that ever documented --
25 that documents that you ever spoke to Chase Wixon?

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102

## Page 70

1 the future I will always run this through the national
2 organization.
3    Q. Sir, do you understand that before this was
4 kicked up to national there were zero conversations
5 between Lyman and Carlos about the allegations? Are you
6 aware of that?
7    A. I wasn't in the office at that time.
8    Q. So why would you sit here and testify to the
9 fact that in order to take Carlos' interests into
10 consideration, and all of that other, that it was kicked
11 up into the national? Why would you testify to that?
12    A. Because that was the conversation and a
13 belief that we had after the -- the investigation.
14    Q. And in addition, I understood -- and you
15 correct me if I'm wrong -- you had no communications
16 during the course of the investigation related to the
17 processing or the allegations that led to the
18 investigation.
19    A. No.
20    Q. That's true, right?
21    A. That's true.
22    Q. So the whole thing about taking Carlos' best
23 interests in effect, that's why it was kicked up --
24    A. Well, I --
25    Q. No. Hold on a second.

## Page 71

1    A. I apologize.
2    Q. And that testimony, it's assumption and
3 presumption on your part, right?
4    A. Yes.
5    Q. All right. Now, I'm looking on here. I'm
6 on that same paragraph, sir. "At the meeting in February
7 2012" -- it's the second page. "I was also told that
8 sexual harassment training would be implemented as soon
9 as possible." Well, that's what you told Liza Bley,
10 right?
11    A. Yes.
12    Q. "Since then I have been told several times
13 by Mr. Shelby that they were investigating trainings and
14 it would be available soon." Well, that's not true, is
15 it?
16    A. We were not investigating trainings. No.
17 We were waiting for the update from the national
18 organization. And I was told it would be available soon.
19    Q. Do you know why Ms. Bley would write that if
20 it weren't true?
21    A. What -- what -- I think there's just a
22 confusion on Liza -- on Liza's part. I don't think she's
23 intentionally writing something that's untrue. That
24 doesn't sound like Liza. You know, I'd continue to
25 review this and she felt uncomfortable when I would give

## Page 72

1 her updates. You know, my intent of giving her updates
2 was to reassure her we were working on that.
3     And unfortunately, she took it as she was
4 the office watchdog. But I would have confidential
5 conversations, she'd be working in a cube and I would go
6 to her and say, "Hey. We're still working on this."
7     I never intended to make her feel like the
8 office watchdog. And she may have felt the training was
9 to appease her as she writes here, but my intent was to
10 get the training conducted because it was important to
11 follow through on my word.
12    Q. How many times did you contact the national
13 office with regards to when this training would be ready
14 after you had the initial contact and you were told that
15 it was being revamped?
16    A. Two to three.
17    Q. And you always talked to Jim Gilbert's
18 assistant?
19    A. I believe so. You know, and I recognize
20 what I should have done there. I recognize I should have
21 pushed harder for that training or found out what we
22 could have done to have that training completed.
23    Q. Did it surprise you, sir, at how quickly
24 that training was available after the allegations against
25 Carlos came forward?

## Page 73

1    A. Yeah. Yes. Excuse me.
2    Q. Let me show you another exhibit that was
3 entered into depositions during the course of this week.
4 It's a letter to you from Christopher Orton who was Hope
5 Kitts' representative at that time.
6    A. Yes.
7    Q. When did you first see that letter?
8    A. It was on or around July 10th.
9    Q. Well, how could you have seen it on or
10 around July 10th if you weren't in the workplace?
11    A. I think I was in the workplace then.
12    Q. Oh. So by July 10th you were back?
13    A. It was somewhere around that second week, I
14 think. I think.
15    Q. Because I understood it was five weeks and
16 it began at some point in the first half of June, right?
17    A. It was that first week of June.
18    Q. All right. Now, when you saw that letter
19 was it on or about July 10th?
20    A. Yeah, I think so.
21    Q. And what did you do with that letter after
22 you received it?
23    A. I believe I forwarded it off to the
24 appropriate people.
25    Q. Who were the appropriate --

## Page 74

1  A. To either Jim Gilbert or Ron Lunsford or --
2  that's what I believe I did.
3  Q. Well see, you were sitting right there in
4  that chair this morning when I showed Lyman the e-mails
5  to Gilbert where he forwarded this letter.
6  A. Okay. Then I must have forwarded it to --
7  or did I get this or was it sent to -- to directly to
8  Lloyd? I don't remember.
9  Q. Well, if you don't remember -- see sir, I
10  would feel much more comfortable, I mean, much more
11  comfortable if you would just say, Mr. Shelby, "I don't
12  remember, Mr. Mozes." Or, "I can't recall" rather than
13  testifying about something you think happened or may have
14  happened.
15  A. Well, let's go back to the beginning of this
16  deposition when I was trying to answer -- when I was
17  thinking about the questions and I couldn't answer them.
18  And we went off the record and you were wondering if I
19  have a problem. And while I think I do I'm also trying
20  to answer the questions. Now, if I need to say "I don't
21  remember" I'll keep that in mind for the rest of this
22  deposition. I want you to understand I'm trying to
23  answer your questions to the best of my ability.
24  Q. Well, yeah. You know, the only thing -- I
25  just -- I'm not your attorney. The only thing -- because

## Page 75

1  I'm saying that to protect you, sir. I don't want you to
2  answer questions or guess about answers to questions or
3  speculate about answers to questions --
4  A. Okay.
5  Q. -- when you're really not sure.
6  A. You told me that in the beginning. And I
7  have not -- I didn't deal with this particular piece.
8  Can we take a break?
9  Q. Sure.
10  MR. ARCHULETA: I think we're right where we
11  need to go here.
12  (Break 3:15 to 3:23.)
13  Q. (BY MR. MOZES) Doing all right?
14  A. Yeah.
15  Q. Okay. We're back on the record, Mr. Shelby.
16  I want to talk about discipline just for a second there
17  at the Boy Scouts of America and the Great Southwest
18  Council, all right?
19  A. Yes, sir.
20  Q. Do you know what the phrase "progressive
21  discipline" means?
22  A. No.
23  Q. Never heard it?
24  A. Never.
25  Q. What were the different levels of discipline

## Page 76

1  that could be given to an employee who worked at the
2  offices of the Great Southwest Council?
3  A. Could have reprimand, written or verbal.
4  Could have the employee take certain courses or
5  trainings. Could -- termination is certainly -- that's
6  not a discipline, that's -- you could have a performance
7  improvement plan which would help with performance issues
8  and that's a form of discipline. Those are the ones that
9  come to mind. I can't think of anything else.
10  Q. Suspension?
11  A. Suspension.
12  Q. Termination is a discipline action.
13  A. Okay.
14  Q. Now, would it -- and let me tell you what I
15  mean by progressive, okay? When I say progressive
16  disciplinary action policy, I mean to say that if an
17  employee violates a policy in the workplace or has a
18  performance issue, that they start out from the lowest
19  level of discipline depending upon the severity of the
20  misconduct or performance issue, okay?
21  A. Okay.
22  Q. And routinely the way discipline would be
23  handled is that if they continue in that same context
24  they are going to be bumped up to the next level. If
25  they continue they'll be bumped up to the next level.

## Page 77

1  And if they continue persisting in that action that they
2  would then be terminated.
3  A. Uh-huh.
4  Q. Was that the philosophy underlying
5  disciplinary action in the Boy Scouts of America there at
6  the Great Southwest Council?
7  A. Yeah, I would -- I would think so.
8  Q. Okay.
9  MR. ARCHULETA: Well, Mr. Shelby, was
10  that -- was that the disciplinary --
11  MR. MOZES: No. Excuse me. Charles.
12  Charles. No. Please. Please.
13  MR. ARCHULETA: Well --
14  MR. MOZES: No. Charles, please.
15  MR. ARCHULETA: He said he thinks so.
16  MR. MOZES: Yeah, I know. I heard his
17  answer.
18  MR. ARCHULETA: I'm suggesting that he
19  answer --
20  MR. MOZES: No, no, no, no. Please.
21  MR. ARCHULETA: -- whether he knows.
22  MR. MOZES: Excuse me, Charles. I'm not
23  going to let you do that. I'm not going to let you do
24  that.
25  MR. ARCHULETA: Not going to let me do what?

Page 78

1 Suggest that he answer?
2           MR. MOZES: Yeah. Suggest or coach the
3 witness or interrupt my questioning because you didn't
4 like his answer. I'm not going to do it. So if you want
5 to ask him a question later you certainly can do that. I
6 have no problems whatsoever doing that.
7           MR. ARCHULETA: Well --
8           MR. MOZES: But you've been around these
9 rodeos enough, Charles --
10          MR. ARCHULETA: Sure.
11          MR. MOZES: -- to know that's just not
12 appropriate.
13          MR. ARCHULETA: I'm just saying we've had a
14 lot of discussion here about answering the question based
15 on personal knowledge, based on being able to remember
16 things. And I'm just adding to that --
17          MR. MOZES: I know how to ask a question.
18 So if I need to follow up that question, believe you me,
19 I know how to follow up that question. And if you want
20 to follow up that question you certainly can do that.
21 But you are doing me no favors. And if that's your
22 explanation that you're doing me some kind of favor by
23 interrupting and saying anything in the middle of the
24 question, that certainly is not true, Charles. And
25 again, you're going to have every opportunity to ask this

Page 79

1 gentleman questions if you would like to do that.
2           MR. ARCHULETA: Well, I didn't interrupt in
3 the middle of a question. I waited until after the
4 question and then I added a suggestion. And I think if
5 you'd like we'll move on and I will follow up with a
6 question if necessary as you suggest. How's that?
7           MR. MOZES: That sounds great. That sounds
8 fabulous. That way we can do it in accordance with the
9 Rules.
10     Q. (BY MR. MOZES) Now, is it your
11 understanding, Mr. Shelby, that up until the time that
12 Carlos was terminated from the Great Southwest Council
13 that he had never been disciplined for any reason, right?
14     A. That's my understanding.
15     Q. Now, I neglected to tell you this back when
16 I was asking a series questions about it. Have you ever
17 received any training, any workplace training from the
18 Boy Scouts with how to conduct an investigation?
19     A. No.
20     Q. It's Lunsford 21, Mr. Shelby. Okay. Now,
21 we looked at this previously. And would you agree with
22 me that that's your signature down there at the bottom
23 where it says "Employee's Signature" and you dated it
24 8/10/12?
25     A. Yes.

Page 80

1     Q. And what I want to do is direct your
2 attention to the second full paragraph.
3     A. Yes.
4     Q. And I'm looking at the third line that
5 begins, "Further." Do you see where I'm referring to?
6     A. Yes.
7     Q. Where it says, "Further, you should not have
8 any discussion with any employees about the existence or
9 nature of this investigation or its outcome."
10    A. Yes.
11    Q. Now, the first thing that I want to focus in
12 on is the nature of this investigation. Now, prior to
13 the investigation that's referenced in Exhibit No. 21,
14 were you part of an investigation related to your
15 misconduct in the workplace?
16    A. Yes.
17    Q. And did you give any written statements in
18 relation to that investigation?
19    A. No.
20    Q. Do you know whether anyone else was
21 interviewed in relation to that investigation?
22    A. I don't know.
23    Q. And did anyone ever explain to you why
24 that -- why you would be immediately terminated if you
25 shared with anyone the fact that you had received this

Page 81

1 written reprimand?
2     A. No.
3     Q. And is it your understanding that this
4 particular document is still in your personnel file,
5 right?
6     A. Yes.
7     Q. And it will remain in your personnel file as
8 long as you're associated or employed by the Boy Scouts
9 of America, right?
10    A. Yes.
11    Q. Okay. Let me make sure I put this back
12 together. Now, what I'm going to do is I'm going to hand
13 you a document. I'm going to put them both together just
14 for your convenience. They've both been entered as an
15 exhibit so I'm not going to reenter them. And I'm going
16 to ask you to look at both of these and then I'm going to
17 ask you a question.
18    A. Okay.
19    Q. Now, the first page is a series of e-mails
20 moving that July 27th letter back and forth between
21 different management employees employed by the Boy
22 Scouts, right?
23    A. Correct.
24    Q. And would it be fair to say that with
25 regards to that letter you had no input in the content?

21 (Pages 78 to 81)

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102

Page 82

1    A. Correct.
2    Q. Did anyone, Mr. Shelby, ever -- and I mean
3  ever up until today -- ever tell you what specific
4  policies Carlos had allegedly violated that led to his
5  termination? Did anyone ever tell you?
6    A. I don't recall.
7    Q. Let me just switch out. Prior to you
8  signing off on this letter, Mr. Shelby, to Carlos, July
9  27, 2012 did you have any discussions with anyone about
10 the content?
11   A. No.
12   Q. Mr. Shelby, were you a witness in the
13 unemployment hearing that was conducted on Mr. Martinez's
14 unemployment claim?
15   A. Yes.
16   Q. You testified?
17   A. Yes.
18   Q. Did you testify under oath?
19   A. Yes.
20   Q. And under oath you testified that
21 Mr. Martinez had been hired -- had been fired for sexual
22 harassment, right?
23   A. Yes.
24   Q. And you were actually sitting again there
25 yesterday when both Gilbert and Lunsford testified that

Page 83

1  Mr. Martinez was not fired for sexual harassment, right?
2    A. I believe they cited a number of issues.
3    Q. Do you want to go through them? If you need
4  to go through them we can go through them.
5    A. No. No, I don't need that.
6    Q. Behavior that was disruptive to the smooth
7  functioning of the workplace --
8    A. Yeah.
9    Q. -- immoral and indecent conduct. And you
10 know that they related that solely to the romantic
11 relationship policy.
12   A. Yep.
13   Q. So I just want to know, when you testified
14 under oath previously to the hearing officer on
15 Mr. Martinez's unemployment claim why did you say that he
16 had been fired for sexual harassment?
17   A. As I recall, the hearings officer wanted
18 documentation so I gathered the documentation as to why
19 he was terminated, read it, and sent it in. And that was
20 my interpretation of it. I did not talk to anyone, I
21 just read those statements and sent it in.
22       MR. MOZES: Could you read that last answer
23 back.
24       (Requested portion was read.)
25   Q. (BY MR. MOZES) Did you send in the

Page 84

1  executive summary report?
2    A. I didn't have that report.
3    Q. And I'm talking about the executive summary
4  report that was written by Jim Gilbert.
5    A. That's correct.
6    Q. Well, how could you not have had that report
7  if it was written in July of 2012?
8    A. It wasn't given to me.
9    Q. You know that Jim Gilbert sent that down to
10 the offices of the Great Southwest Council. You knew
11 that, right?
12   A. No, I didn't know that.
13   Q. So I just want to make sure I understand
14 what you're saying. You're saying that, "I had Liza
15 Bley's and Juliana Cabral's statements and based upon
16 those statements I concluded that Mr. Martinez had been
17 fired for sexual harassment and that's why I testified
18 earlier to the unemployment hearing officer of that."
19   A. That was my interpretation.
20   Q. Did anyone else from the Boy Scouts of
21 America testify during that unemployment hearing with
22 respect to the reasons for which Mr. Martinez was
23 terminated?
24   A. I believe Lloyd Lyman was part of that call
25 and Liza Bley was part of that call. Liza. Excuse me.

Page 85

1  Liza Bley.
2    Q. And during that hearing did Lloyd Lyman also
3  testify that Mr. Martinez was terminated because of
4  sexual harassment?
5    A. I don't recall.
6    Q. So were you surprised yesterday when both
7  Lunsford and Gilbert testified that they could not
8  conclude whether Mr. Martinez had engaged in sexual
9  harassment or not? Were you surprised by that testimony?
10   A. No.
11   Q. This was also entered as an exhibit
12 previously. Let's stick that one here because it's got a
13 tag on it. I can't remember what number it was but I'm
14 not going to look at it. It's the termination notice.
15   A. Yes.
16   Q. "Request to Initiate the Termination
17 Process." Does your signature appear anywhere on that
18 document?
19   A. Yes.
20   Q. Can you indicate to me where?
21   A. Under Scout Executive Signature. For
22 Shelby, 7/27/12.
23   Q. Okay. There you go. Then you will see it
24 says that he would not -- the Boy Scouts of America would
25 not recommend that Carlos be rehired, right?

22 (Pages 82 to 85)

**Page 86**

1  A. Correct.
2  Q. And where it says, "This -- this separation
3  causes a vacancy," and you said "no," right?
4  A. Correct.
5  Q. Now, and the document is dated by you July
6  27, 2012. That was the same day you give Carlos the
7  termination letter, right?
8  A. I did not give Carlos the termination
9  notice.
10 Q. That's the same day you signed it.
11 A. Yes.
12 Q. And had you already decided, Mr. Shelby, to
13 replace Carlos with Barbara Johnson by that date?
14 A. What this document does, it creates a
15 vacancy within the professional development department
16 that kicks in a vacancy for a professional scouter to
17 apply for this job.
18    And I didn't want the national organization
19 to create a listing on the vacancy roster going to -- it
20 would be posted on the web that we had a vacancy for a
21 professional employee. So that's the reason that "X" is
22 there. Not because any decision had been made other than
23 we were not going to put a professional. And a
24 professional is a district executive into that role.
25 Q. Was Barbara Johnson ever a professional

**Page 87**

1  employee?
2  A. No.
3  Q. Do you have to be full-time to be a
4  professional employee?
5  A. Yeah. It -- you have to go through a
6  screening process, you have to attend a week-long
7  training course. You know, it's ...
8  Q. Do you have to be full-time to be a
9  professional employee?
10 A. We only hire full-time professional
11 employees. I can't speak for what other councils, and I
12 don't know what their requirements are.
13 Q. Prior to marking that "no" box did you talk
14 to any HR representative or national about how you should
15 appropriately mark that "no" box? How you should
16 appropriately mark that?
17 A. No.
18 Q. Certainly you didn't ask permission from
19 anybody to do that, right?
20 A. No.
21 Q. Had you ever done that before?
22 A. It creates a vacancy mark it no?
23 Q. No. Had you ever done it that you marked
24 "no" so that it would not kick in a professional opening
25 on the database?

**Page 88**

1  A. I don't recall.
2  Q. Can I see that one more time?
3  A. Yes, sir.
4  Q. Why didn't you mark off that, "We would
5  prefer" area on that document?
6  A. I'm sorry?
7  Q. It's right underneath your signature there.
8  It's the last line. Why didn't you mark that?
9  A. Because it didn't create a vacancy. And
10 this -- this box is stating if we create a vacancy are we
11 preferring a new district executive or an experienced
12 district executive? And therefore, I didn't check those
13 boxes.
14 Q. Is that form only used with professional
15 employees?
16 A. Yeah. It says here, "in order to finalize a
17 termination of a Professional Scouter."
18 Q. Can I just see it a second?
19 A. Sure.
20 Q. Well, you know, this form -- yeah. I'm
21 going to give it back to you because I want Mr. Archuleta
22 to see it as well. But I want you to read the second
23 sentence that begins, "Scout Executives." The second
24 sentence in that if you could you just read it into the
25 record.

**Page 89**

1  A. Out loud?
2  Q. Yeah. I do.
3  A. "Scout Executives are directed to confer
4  with and seek advice from their Area Director to ensure
5  the decision to terminate is in accordance with Council
6  policies and practices and that it is consistent with the
7  values and the mission of the Boy Scouts of America."
8  Q. Now, I just want to make sure that I
9  understand what happened in this case. You never had the
10 opportunity to seek advice or to evaluate whether this
11 termination was in accordance with scout values or
12 policies and procedures because you were never involved
13 in the termination action itself other than to sign off
14 on the letter, right?
15 A. Correct.
16 Q. So as far as you seeking advice from someone
17 else as to the propriety of the termination of Carlos
18 Martinez, you never did that, did you?
19 A. No.
20 Q. Okay.
21    MR. MOZES: I just need a minute, Charles.
22    MR. ARCHULETA: Sure.
23    (Break from 3:56 to 4:03.)
24    MR. MOZES: Pass the witness.
25       * * *

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE NM 87102