IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CARLOS E. MARTINEZ,

    Plaintiff,

v.                                                        No. CIV 13-1049 RB/LAM

GREAT SOUTHWEST COUNCIL—
BOY SCOUTS OF AMERICA, and
THE BOY SCOUTS OF AMERICA,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

Plaintiff Carlos E. Martinez sued his former employer, Defendant Great Southwest Council—Boy Scouts of America, and the national council, Defendant Boy Scouts of America. Both Defendants moved separately for summary judgment. (Docs. 40, 41.) Having reviewed the parties' submissions and arguments, the Court **GRANTS** both motions.

    I.    BACKGROUND

Plaintiff started working at Defendant Great Southwest Council—Boy Scouts of America ("GSC") in October 2009. (Doc. 40, DUMF ¶ 1.) He worked as the district director of the scoutreach juvenile diversion program. (Ex. A, Doc. 41-1.) Although hired by Defendant GSC, Plaintiff's hire letter expressly states that his "employment is contingent upon . . . meeting all criteria for membership in the Boy Scouts of America." (*Id*.)

Plaintiff was hired as an "at will" employee. (Ex. A, Doc. 40-1.) He was given a Professional Staff Employee Handbook which included personnel policies and procedures. (Ex. X, Doc. 41-24.) Defendant Boy Scouts authored the employee manual and various workplace rules that Plaintiff was required to follow. (Ex.1, Lunsford Dep. 16:3-18:15, Doc. 45-1.)

Plaintiff understood, based on these policies, that Defendants had a progressive discipline policy. (Ex. 3, Shelby Dep. 75:2-77:7, Doc. 45-3.)

The handbook included at least four disclaimers which emphasize that none of the provisions create an employment contract. An inside page of the handbook stated that the "policies and practices may be changed without notice" and should not be "relied on as a contractual obligation of the Great Southwest Council to its employees . . . ." (Ex. AA, Doc. 41-27.) It further says that "nothing in this handbook . . . limits the right of the Great Southwest Council or its employees to terminate their relationship at any time with or without reason." (*Id.*) Page 1-1 of the handbook states that none of the terms are "intended to create any contractual rights in favor of" employees or the GSC. (Ex. X, Doc. 41-24.) GSC expressly "reserves the unilateral right to change, without notice, any of the provisions at any time and in any manner." (*Id.*) On page 2-1, the handbook reiterates that employment is at will and that the handbook is "not a contract or other legal guarantee . . . ." (Ex. Y, Doc. 41-25.) Finally, when Plaintiff received the handbook, he signed an acknowledgment that he read the handbook and understood that it does not "create any contractual rights in favor of" employees or the GSC. (Ex. Z, Doc. 41-26.)

In his workplace, Plaintiff repeatedly complained of poor treatment. He made three written complaints that his direct supervisor, Lloyd Lyman, and the GSC Scout Executive, Chris Shelby, were rude, unprofessional, and overly aggressive. (Ex. U, Doc. 41-21; Ex. 6, Doc. 50-6.) He also witnessed Mr. Shelby make multiple derogatory jokes about Latinos. (Ex. T, Dep. Martinez, 185:4-11, Doc. 41-20.) In particular, Mr. Shelby would regularly imitate the accent of one Mexican worker in the office, Luis Del Valle. (Ex. 8, Martinez Dep. 183:4-184:2, Doc. 50-8.) Plaintiff, who is of Latino descent, witnessed these remarks and found them "very

offensive." (*Id.*)  Mr. Shelby was reprimanded for his inappropriate conduct towards Mr. Del Valle and for his condescending remarks to other GSC employees.  (Ex. 9, Doc. 50-9.)  Although Plaintiff made at least three complaints of his own, no one at the GSC or Boy Scouts is aware of Plaintiff's complaints being investigated.  (Ex. J, Miller Dep. 38:8-25; Ex. 3, Lunsford Dep. 71:1-3; Ex. 4, Shelby Dep. 36:13-18.)  According to the handbook, all complaints of harassment must be investigated.  (Ex. 4, Shelby Dep. 44:25-45:9, Doc. 50-4.)

Plaintiff supervised several employees, including Ms. Hope Kitts.  (Doc. 40, DUMF ¶ 5.)  Plaintiff and Ms. Kitts began having a consensual dating and sexual relationship.  (Ex. 7, Martinez Dep. 54:12-14, Doc. 45-7.)  They had three dates over the space of two weeks.  (Ex. 8, Martinez Dep. 86:18-87:2, Doc. 50-8.)  Plaintiff decided to break off the relationship because it was inappropriate.  (Doc. 45 PMF ¶ 4.)  Ms. Kitts resigned from the GSC shortly thereafter on June 6, 2014.  (Doc. 40, DUMF ¶ 6.)

On July 8, 2012, Ms. Kitts complained to Defendant GSC that Plaintiff sexually harassed her.  (Doc. 40, DUMF ¶ 7.)  Through her lawyer, Ms. Kitts also accused Plaintiff of sexual assault.  (Doc. 40, DUMF ¶ 9.)  Two days later, Ms. Juliana Cabral and Ms. Liza Bley, both Plaintiff's subordinates, reported that Plaintiff had subjected them to "sexually inappropriate conduct."  (Doc. 40, DUMF ¶ 8.)  On July 12, 2012, Defendant GSC, upon Defendant Boy Scout's direction, suspended Plaintiff with pay to permit an investigation of Ms. Kitt's, Ms. Cabral's, and Ms. Bley's allegations.  (Ex. 2, Lyman Dep. 86:15-21, Doc. 45-2.)

Two Boy Scouts employees, Ron Lunsford and Jim Gilbert, led the investigation.  (Ex. K, Miller Dep. 23:24-24:2, Doc. 40-11.)  The investigation was inconclusive and the investigators did not determine that Plaintiff sexually harassed any of the three employees.  (Ex. M at 3, Doc. 40-13.)  The investigation did conclude that Plaintiff had a consensual relationship

with Ms. Kitts and that he "behaved inappropriately as a manager with" his female subordinates. (*Id.*)  Defendants have a policy prohibiting "romantic relationships between a direct supervisor and subordinate."  (Ex. N, Doc. 40-14.)  The policy provides three disciplinary options for violators of the policy, including "(1) a transfer of one of the parties to another position if another position is available, (2) resignation of one of the parties, or (3) termination of the supervisor."  (*Id.*)  Plaintiff admits that he violated this policy.  (Doc. 50 ¶ 5.)  Based on their findings, the Boy Scouts investigators recommended terminating Plaintiff's employment.  (Ex. M, Doc. 40-13.)

An agent of the national council told the GSC Board that it had "no choice in the matter" and needed to terminate Plaintiff.  (Ex. 4, Miller Dep. 22:11-15, Doc. 45-4.)  Defendant Boy Scout's legal department composed the letter.  (Ex. 1, Lunsford Dep. 97:13-25, Doc. 45-1.)  Although he had no opportunity to independently evaluate the termination, GSC Scout Executive, Chris Shelby, signed the termination letter.  (Ex. S, Doc. 40-19; Ex. 3, Shelby Dep. 89:9-14, Doc. 45-3.)  In Plaintiff's stead, Defendant GSC hired Barbara Johnson.  (Ex. 4, Shelby Dep. 46:12-14, Doc. 50-4.)

Plaintiff felt that his investigation was unfair.  Plaintiff was never disciplined before he was investigated and then fired.  (Doc. 45 PMF ¶ 2.)  Plaintiff argues that non-Hispanic employees accused of harassment were treated better.  (Doc. 50 at 15.)  He cites Mr. Shelby, who was accused of national origin harassment and given a letter of reprimand (Ex. 9, Doc. 50-9), and Mr. Chase Wixon who was twice accused of inappropriate behavior and given a letter of reprimand.  (Ex. L, Miller Dep. 66:6-68:19.)

After exhausting his administrative remedies, Plaintiff filed a Complaint with this Court on October 28, 2013.  (Compl., Doc. 1)  Naming GSC and the Boy Scouts as Defendants,

Plaintiff claims Defendants engaged in reverse gender discrimination and national origin discrimination in violation of Title VII. (Am. Compl. ¶¶ 33-54, Doc. 31.) He also claimed damages for a breach of an implied contract. (*Id.* ¶ 56-63.) Plaintiff originally sued a third defendant, his supervisor, Chris Shelby. The parties stipulated to Defendant Chris Shelby's dismissal. (Doc. 48.) Now, the two remaining defendants, GSC and Boy Scouts, move for summary judgment in separate motions. (Docs. 40, 41.)

## II. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could influence the determination of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a reasonable trier of fact could return a verdict for either party. *Id*. At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006). If there is a genuine dispute of material fact, then the "facts must be viewed in the light most favorable to the nonmoving party . . . ." *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## III. DISCUSSION

Plaintiff brings three claims against Defendant GSC and two claims against Defendant Boy Scouts. He alleges that Defendant GSC is liable for gender discrimination, national origin discrimination, and breach of implied contract. He holds Defendant Boy Scouts liable for gender discrimination and breach of implied contract. Defendant Boy Scouts responds that it cannot be

liable because it was not Plaintiff's employer.  The Court begins by analyzing this defense, then evaluates Plaintiff's substantive claims.

### A. Employer Liability under Title VII

To make out a prima facie case of discrimination under Title VII, the plaintiff must first prove that the defendant was his employer.  *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1225 (10th Cir. 2014); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1069 (10th Cir. 1998).  Here, at the summary judgment stage, Plaintiff must prove that a reasonable jury could find that Defendant Boy Scouts was his employer.

The law allows organizations to isolate liabilities among separate entities.  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1362 (10th Cir. 1993).  Plaintiff concedes that Defendant GSC and Defendant Boy Scouts are two separate entities.  Although the Parties never explain the exact nature of the relationship between the local and national affiliate, the Parties agree that Defendant GSC was Plaintiff's employer.  The question is whether Defendant Boy Scouts is also Plaintiff's employer.  "[W]hen an employee of one entity seeks to hold another entity liable as an employer," the Tenth Circuit applies the joint employer test.  *Bristol v. Bd. of Cnty. Comm'rs*, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc).

"Under the joint employer test, two entities are considered joint employers if they 'share or co-determine those matters governing the essential terms and conditions of employment.'" *Knitter*, 758 F.3d at 1226 (quoting *Bristol*, 312 F.3d at 1218).  "[J]oint employer status is determined by focusing on the entities' relationships to a given employee or class of employees." *Sandoval v. City of Boulder*, 388 F.3d 1312, 1324 (10th Cir. 2004).  The test is employee-specific.  *Id.*  Both entities are employers if they "exercise significant control" over the employee. *Id.* (quoting *Bristol*, 312 F.3d at 1218).

The right to terminate an employee is the most important factor when analyzing control. *Bristol*, 312 F.3d at 1219.  Plaintiff argues that Defendant Boy Scouts "recommended, decided, and approved" his termination.  (Doc. 45 at 5.)  Defendant Boy Scouts admits that it conducted the investigation and recommended Plaintiff's termination, but says that its involvement ended there.  (Doc. 40 ¶¶ 11, 20.)  Defendant Boy Scouts avers that the GSC retained its discretion and did not have to follow any of Defendant Boy Scouts' employment recommendations.  (Doc. 40 ¶ 22.)  Defendant Boy Scouts did not attach the cited evidentiary support for this proposition.

Plaintiff argues that Defendant GSC was obliged to follow Defendant Boy Scout's determination.  The GSC Board President, Ben Miller, testified in his deposition that the GSC Board was not involved in the decision to terminate and never received any documentation related to the investigation.  (Ex. 4, Miller Dep. 22:3-5; 24:7-11, Doc. 45-4.)  An agent of the national council told the GSC Board that it had "no choice in the matter" and needed to terminate Plaintiff.  (*Id.* 22:11-15.)  While the GSC executive, Chris Shelby, signed the termination letter, Defendant Boy Scout's legal department composed the letter.  (Ex. 1, Lunsford Dep. 97:13-25, Doc. 45-1.)  Mr. Shelby testified that he had no opportunity to independently evaluate the termination and merely "sign[ed] off on" the letter.  (Ex. 3, Shelby Dep. 89:9-14, Doc. 45-3.)  At Plaintiff's unemployment insurance hearing, Mr. Shelby was not even familiar with the reason why Plaintiff was terminated.  (Ex. 3, Shelby Dep. 82:12-84:19, Doc. 45-3.)  Defendant GSC, in its separate motion, claims that "[n]either Mr. Shelby nor Mr. Lyman were involved in the actual termination decision."  (Doc. 41 at 17.)  If Plaintiff's two GSC supervisors were not involved in the termination decision and the GSC Board was not involved in the termination decision, who terminated Plaintiff?  By ruling out all the decisionmakers at the GSC, Plaintiff makes a good argument that Defendant Boy Scouts' had a role in his termination.

Additionally, Plaintiff points to several other facts that suggest Defendant Boy Scouts may have exercised significant control over Plaintiff's employment relationship: (1) Plaintiff's hire letter expressly states that his "employment is contingent upon . . . meeting all criteria for membership in the Boy Scouts of America." (Ex. A, Doc. 40-1.); (2) Defendant Boy Scouts may have had power to discipline Plaintiff based on the fact that Boy Scouts employees directed the GSC to suspend Plaintiff during the investigation and GSC staff merely "carried out" the suspension order. (Ex. 2, Lyman Dep. 86:15-21, Doc. 45-2.); (3) Defendant Boy Scouts authored the employee manual and various workplace rules that Plaintiff was required to follow. (Ex.1, Lunsford Dep. 16:3-18:15, Doc. 45-1.); and (4) Defendant Boy Scouts established Plaintiff's compensation plan and benefits program. (Ex. A, Doc. 40-1.) These all represent additional factors that a court can consider when analyzing control under the joint employer test. *Knitter*, 758 F.3d at 1226 (listing factors including promulgation of work rules, compensation, benefits, and employee discipline).

In turn, Defendant Boy Scouts provides evidence that the GSC hired Plaintiff and that the GSC was listed as Plaintiff's employer on his W-2. (Ex. A, Doc. 40-1; Ex. C, Doc. 40-3.) However, this is not enough to conclusively decide the control issue. Plaintiff provided sufficient evidence to create a factual dispute over whether Defendant Boy Scouts had sufficient control over Plaintiff's employment to be considered his joint employer.

The Court will consider the rest of Defendant Boy Scouts' Motion in conjunction with Defendant GSC's motion.

### B. Reverse Discrimination Claim

Plaintiff asserts that both Defendant GSC and Defendant Boy Scouts are liable for his sex discrimination claim. Title VII provides that it is unlawful "for an employer . . . to discriminate

against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. 2000e-2(a).  Because Defendant is a male and his occupation was not historically dominated by females, his claim is considered a "reverse discrimination" claim.

Generally, to assert a prima facie case of gender discrimination, plaintiffs must show that (1) they are a member of a protected class; (2) they suffered an adverse employment action; (3) they are qualified for the position at issue; and (4) they were treated less favorably than others not in the protected class.  *Khalik v. United Air Lines*, 671 F.3d 1188, 1192 (10th Cir. 2012).  In a reverse gender discrimination case, however, the plaintiff 'must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.'" *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006); *see also Clark v. Cache Valley Elec. Co.*, 573 F. App'x 693, 697 (10th Cir. 2014) (quoting same).

Plaintiff does not offer any evidence to establish the "background circumstances" supporting an inference that Defendant Boy Scouts or Defendant GSC discriminates against men.  He instead relies on the direct method. (Doc. 45 at 12.)  Under the direct method of proof, "a plaintiff may produce facts sufficient to support a reasonable inference that but for plaintiff's status the challenged decision would not have occurred." *Argo*, 452 F.3d at 1201.  Plaintiff first relies on several facts related to his investigation, none of which are disputed: (1) Plaintiff was suspended with pay during the investigation against him; (2) Plaintiff was not allowed to discuss the investigation with any coworkers; (3) the three female complainants were not terminated; and (4) the policy forbidding workplace relationships gave three options for disciplining supervisors who disobeyed the policy and Defendants chose the most severe discipline.  (Doc. 45 at 12-13;

9

Doc. 50 at 5.)  Plaintiff does not explain and the Court fails to see why any one of these facts supports an inference of sex discrimination.  Every one of the offered facts, all undisputed, appears to be a discretionary business judgment.  The Court's "role is to prevent unlawful hiring practices, not to act as a 'super personnel department' that second guesses employers' business judgments."  *Dalpiaz v. Carbon Cnty.*, 760 F.3d 1126, 1133 (10th Cir. 2014) (quoting *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1233 (10th Cir. 2000)).

Plaintiff next argues that he was terminated even though the sexual harassment claims were unsubstantiated.  (Doc. 45 at 12.)  Again, Defendants do not dispute this fact.  Plaintiff claims that the female complainants were treated better than he was during his investigation because everything they said was "taken at face value." (Doc. 50 at 5.)  However, Defendants did not conclude the investigation in favor of the female complainants.  (Ex. Q, Gilbert Dep. 29:16-23, Doc. 41-17.)  Plaintiff does not dispute this fact.  Defendants explain that Plaintiff was terminated for having a workplace relationship in violation of company policy, not because of sexual harassment.  (Doc. 40 at 9.)  Plaintiff admits to having a sexual relationship with his subordinate in violation of company policy.  (Doc. 50 ¶ 5.)  Thus, Defendants offer a nondiscriminatory reason for terminating Plaintiff's employment.

Finally, Plaintiff argues that Defendant's given reason for his termination is pure pretext. He says that Defendants shifted their stated reason for Plaintiff's termination.  Originally, based on his interactions with Chris Shelby, Plaintiff argues, "[t]he understanding" was that he had been fired for sexual harassment.  (Doc. 45 at 12.)  However, after Plaintiff filed this suit, Defendant Boy Scouts clarified that Plaintiff was fired for violating the company's policy against workplace relationships.  (*Id.*)  Shifting reasons for termination can give rise to an inference of pretext.  *See McGarry v. Bd. of Cnty. Comm'rs*, 175 F.3d 1193, 1200 (10th Cir. 1999).

However, when arguing that Defendant Boy Scouts was his joint employer, Plaintiff offered an alternative, and inconsistent, reason for this shift. He argued that the GSC and Chris Shelby did not know why Plaintiff was fired, bolstering his argument that his termination was orchestrated by Defendant Boy Scouts. Plaintiff cannot simultaneously argue that the differing reasons are a synchronized plot to dissemble and a sign that the two Defendants were not communicating. Plaintiff's proffered evidence of pretext is insufficient to overcome Defendants' nondiscriminatory reason for terminating Plaintiff's employment.

In sum, Plaintiff did not produce sufficient evidence that decisionmakers at Defendant Boy Scouts or Defendant GSC would not have terminated Plaintiff but for his gender. Because there are no genuine disputes of material fact, the Court grants summary judgment to Defendant Boy Scouts and Defendant GSC on this claim.

### C. National Origin Claim

Plaintiff claims that Defendant GSC discriminated against him based on his national origin. Defendant GSC denies the claim and moves for summary judgment. Title VII provides that it is unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. 2000e-2(a).

To prove his claim, Plaintiff invokes the burden shifting framework of *McDonnell Douglas*. (Doc. 50 at 11.) To prove a prima facie case of national origin discrimination, Plaintiff must prove (1) he is a member of a protected class, (2) he suffered an adverse employment action, (3) he qualified for the position at issue, and (4) he was treated less favorably than others not in the protected class. *Khalik*, 671 F.3d at 1192.

1. *Plaintiff's Prima Facie Case*

The parties do not argue over the first three prongs of Plaintiff's prima facie case. Plaintiff, a Latino male, was hired for the program director position and, after three years, was terminated. The Court notes, however, that Plaintiff finds himself in the uncomfortable position of arguing against himself on the adverse action prong. To support his joint employer argument, Plaintiff claimed that "no GSC executive or employee was involved in the decision to terminate—it was solely BSA national employees." (Doc. 50 at 4.) Seven pages later, in support of his national origin discrimination claim, Plaintiff claims that "GSC discharged Martinez." (Doc. 50 at 11.) The Court cannot resolve all the factual disputes in favor of the plaintiff when the plaintiff disputes his own facts. However, because Plaintiff's claim fails on other grounds, the Court can sidestep the morass. Accordingly, the Court now turns to the fourth prong of the prima facie case. Plaintiff produces several pieces of evidence in support of his claim that he was discriminated against based on his national origin.

First, Plaintiff points to a series of discriminatory slurs and jokes that his GSC supervisor, Chris Shelby, made. (Doc. 40 at 12.) Plaintiff avers that Mr. Shelby made several jokes, between five and fifteen, about Hispanics. (Ex. T, Dep. Martinez, 185:4-11, Doc. 41-20.) Mr. Shelby also regularly impersonated another GSC employee who had a "thick Mexican accent." (Ex. 8, Martinez Dep. 183:4-184:2, Doc. 50-8.) Plaintiff, who was often present during these imitations, found them "very offensive." (*Id.*) Mr. Shelby was reprimanded for his "inappropriate" imitations. (Ex. 9, Doc. 50-9.) Defendant GSC downplays the importance of this evidence noting that the discriminatory actions were directed at a coworker, not at Plaintiff. (Doc. 41 at 9-10.) The Court finds this distinction unavailing. Derogatory remarks aimed at coworkers are evidence of animus. *See Young v. Dillon Companies, Inc.*, 468 F.3d 1243, 1252

(10th Cir. 2006). And because he was present, Plaintiff can testify about the remarks and imitations. *Id.*

Second, Plaintiff made several complaints about his supervisors' behavior, but his complaints were never investigated. (Doc. 50 at 13-14.) During his employment, Plaintiff made three written complaints regarding the rude and unprofessional behavior of his supervisors, Mr. Shelby and Mr. Lyman. (Ex. U, Doc. 41-21; Ex. 6, Doc. 50-6.) Defendants had a policy of investigating all harassment complaints (Ex. 4, Shelby Dep. 44:25-45:9, Doc. 50-4), but no Defendant recalls investigating Plaintiff's complaints. (Ex. J, Miller Dep. 38:8-25; Ex. 3, Lunsford Dep. 71:1-3; Ex. 4, Shelby Dep. 36:13-18.) Plaintiff notes that in comparison, Ms. Kitts' complaint was promptly investigated. Ms. Kitts is white, of non-Latino origin. (Doc. 50 at 15.) Plaintiff's written complaints describe opprobrious behavior, poor systems, inadequate training, and unreasonable deadlines. (Ex. U, Doc. 41-21; Ex. 6, Doc. 50-6.) Most of these complaints describe unprofessional conduct, but not necessarily discriminatory harassment.

Third, Plaintiff complains that the investigation against him was conducted unfairly. Plaintiff argues that he was treated disparately and that non-Hispanic employees accused of harassment were treated better. (Doc. 50 at 15.) He cites Mr. Shelby, who was accused of national origin harassment and given a letter of reprimand (Ex. 9, Doc. 50-9), and Mr. Chase Wixon who was twice accused of inappropriate behavior and given a letter of reprimand. (Ex. L, Miller Dep. 66:6-68:19.) He also notes that Defendant GSC violated its own termination policy. (Doc. 50 at 15.) According to policy, Mr. Shelby as the Scout Executive should have taken steps to ensure that the termination accorded with Boy Scout policies, but Mr. Shelby did not conduct an independent investigation into the propriety of Plaintiff's termination. (Ex. 3, Shelby Dep. 89:3-15.)

Finally, Plaintiff notes that he was replaced by Barbara Johnson. (Ex. 4, Shelby Dep. 46:12-14, Doc. 50-4.) Barbara Johnson has a non-Hispanic last name.

Overall, Plaintiff produces sufficient evidence to meet the fourth prong of his prima facie case. His evidence permits an inference that he was treated less favorably than others not in his class.

### 2. *Pretextual Argument*

Defendants offer a non-discriminatory reason for Plaintiff's termination. They assert that Plaintiff was terminated for violating the Company's policy against workplace relationships. Defendants have a policy prohibiting "romantic relationships between a direct supervisor and subordinate." (Ex. N, Doc. 40-14.) The policy provides three disciplinary options for violators of the policy, including "(1) a transfer of one of the parties to another position if another position is available, (2) resignation of one of the parties, or (3) termination of the supervisor." (*Id.*) Plaintiff admits that he had a romantic, sexual relationship with his subordinate, Hope Kitts, and acknowledges that this violated company policy. (Doc. 50 ¶ 5.) The executive summary of the investigation into Plaintiff's behavior does not conclude that he sexually harassed his subordinate, but notes that he "behaved inappropriately as a manager." (Ex. M, Doc. 40-13.) Plaintiff argues that this reasoning is pretextual.

First, Plaintiff argues that Defendants could have chosen another disciplinary option instead of termination. (Doc. 45 at 13.) However, businesses have discretion to choose appropriate discipline without court interference. *See Dalpiaz*, 760 F.3d at 1133 (reasoning that the court is not a "super personnel department"). Second, he argues that the romantic relationship is merely an "after-the-fact justification[]" and that he was originally fired for unsubstantiated claims of sexual harassment. (Doc. 50 at 16.) But the investigatory report from

the time does not cite sexual harassment as the reason for termination.  (Ex. M, Doc. 40-13.) The report does reference the policy against supervisor-subordinate relationships.  (*Id*.) Additionally, Plaintiff undermines his pretext argument by explaining that the differing reasons for his termination were not a "shift" but a sign that the two Defendants were not communicating.  *See supra*, Section III.B, pages 10-11.

In sum, while Plaintiff can establish a prima facie case of national origin discrimination, he does not have sufficient evidence to overcome Defendants' nondiscriminatory reason for his termination.  As a result, the Court grants Defendant GSC's motion for summary judgment on this claim.

### D. Implied Contract Claim

Plaintiff claims that both Defendant GSC and Defendant Boy Scouts breached his implied contract with the company.  Although Plaintiff was hired as an "at will" employee, he understood, based on company policy, that Defendants had a progressive discipline policy.  (Ex. 3, Shelby Dep. 75:2-77:7, Doc. 45-3.)  He argues that Defendants did not follow this progressive discipline policy when they terminated his employment.

New Mexico law recognizes that implied contracts can transform an at-will employment relationship into a contractual relationship that "restricts the employer's power to discharge." *Hartbarger v. Frank Paxton Co.*, 857 P.2d 776, 779 (N.M. 1993).  The New Mexico Supreme Court has found implied contracts "where the facts showed that the employer either has made a direct or indirect reference that termination would be only for just cause or has established procedures for termination that include elements such as a probationary period, warnings for proscribed conduct, or procedures for employees to air grievances." *Id.*

As long as the employee "could reasonably expect his employer to conform to the procedures" outlined in an employment manual, it can create an implied contract. *Id.* at 783. The alleged promises, however, must be "sufficiently explicit." *Id.* at 780, 783. Many personnel manuals, such as the one here, contain disclaimers that the manual does not create a contract. In New Mexico, that is not dispositive. "[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created." *Beggs v. City of Portales*, 210 P.3d 798, 803 (N.M. 2009). Disclaimers are one part of the analysis about whether an employee's expectations are reasonable. *See Hartbarger*, 857 P.2d at 784 (considering disclaimers in an implied contract analysis).

The GSC handbook included multiple disclaimers. A front page stated that the "policies and practices may be changed without notice" and should not be "relied on as a contractual obligation of the Great Southwest Council to its employees . . . ." (Ex. AA, Doc. 41-27.) Two inside pages stated similar warnings. (Ex. X, Doc. 41-24; Ex. Y, Doc. 41-25.) Additionally, when Plaintiff received the handbook, he signed an acknowledgment that the handbook does not "create any contractual rights in favor of" employees or the GSC. (Ex. Z, Doc. 41-26.) These provisions make it less likely that Plaintiff's belief in an implied contract was reasonable.

Even if Plaintiff believed that he had an implied contract, despite the multitude of disclaimers, his contract was not breached. The very same policies that created Plaintiff's alleged contract contain a policy prohibiting romantic relationships with subordinates. (Ex. N, Doc. 40-14.) Plaintiff admits that he had a relationship with a subordinate in violation of this company policy. (Doc. 50 ¶ 5.) The policy expressly lists termination as a discipline option for

16

supervisors engaging in romantic relationships with subordinates. (Ex. N, Doc. 40-14.) That policy, too, was a part of the alleged contract. Even if the manual created a contract, Defendants were within their contractual rights when they terminated Plaintiff for violating this policy. Accordingly, the Court grants Defendants' motions for summary judgment on the implied contract claim.

## IV. CONCLUSION

Plaintiff raised a genuine factual dispute that Defendant GSC and Defendant Boy Scouts were his joint employers. However, Plaintiff did not provide sufficient evidence to hold Defendant Boy Scouts liable for his reverse sex discrimination or implied contract claim. Thus, Defendant Boy Scouts' motion for summary judgment is granted. Similarly, Plaintiff did not provide sufficient evidence to hold Defendant GSC liable for sex discrimination, national origin discrimination, or breach of implied contract. As a result, Defendant GSC's motion for summary judgment is also granted.

**THEREFORE**,

**IT IS ORDERED** that:

(1) Defendant Boy Scouts' Motion for Summary Judgment (Doc. 40) is **GRANTED**;

(2) Defendant GSC's Motion for Summary Judgment (Doc. 41) is **GRANTED**; and

(3) The case is terminated.

_____
**ROBERT C. BRACK**
**UNITED STATES DISTRICT JUDGE**